UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- x
                                 :

AIR CHARTER SERVICE INC., AIR CHARTER   :
SERVICE GEORGIA INC., THE TRAVEL        :
DIVISION LTD., and AIR CHARTER SERVICE  :    Civil Action No.: 22-4517
TRUCKING INC.,                            :
                                 :
             Plaintiffs,        :    **COMPLAINT**
                                 :
      vs.                       :
                                 :
AIRBUS AMERICAS INC.,              :
                                 :
             Defendant.      :
                                 :
---------------------------------------------------------------- X

     Plaintiffs AIR CHARTER SERVICE INC., AIR CHARTER SERVICE GEORGIA INC.,
THE TRAVEL DIVISION LTD., and AIR CHARTER SERVICE TRUCKING INC., by their
counsel CONDON & FORSYTH LLP, hereby state their Complaint against Defendant AIRBUS
AMERICAS INC., as follows:

## NATURE OF ACTION

     1.    This is an action for breach of contract, fraudulent inducement, and negligent
hiring, training, and supervision related to written contracts for services in which Plaintiffs AIR
CHARTER SERVICE INC., AIR CHARTER SERVICE GEORGIA INC., THE TRAVEL
DIVISION LTD., and AIR CHARTER SERVICE TRUCKING INC. (collectively "ACS" or "the
ACS entities") seek a money judgment against Defendant AIRBUS AMERICAS INC. ("Airbus")
for unpaid invoices, lost profits, business interruption, and associated costs, fees (including but not
limited to attorney fees), interest, and expenses.

     2.    Carlos Alberto Avellanet ("Mr. Avellanet"), an employee of Airbus, fraudulently
induced ACS into entering Booking Requests (the "Contracts") pursuant to which ACS would (1)
make available an aircraft for charter and/or (2) provide additional travel concierge services.

Pursuant to the Contracts and Mr. Avellanet's representations, which he made to ACS under actual or apparent authority from Airbus, Airbus would pay ACS for these services.

3.      Airbus has not paid certain overdue invoice payments to ACS for the costs ACS incurred in providing its services under the Contracts, and as required by the Contracts. Specifically, Airbus refuses to make payment on invoices related to the Contracts entered into on its behalf by Mr. Avellanet.

4.      Additionally, the Contracts provided that Airbus agreed to make payments of certain portions of the full charter price in the event Airbus cancelled the flight before the scheduled date of departure.  Airbus cancelled several flights prior to the scheduled dates of departure but has not made payment to ACS under the Contracts.

5.      Despite ACS's attempts to collect payment from Airbus in accordance with the terms of the Contracts, Airbus has refused to make such payment.  This action follows.

## PARTIES

6.      Air Charter Service Inc. is a corporation organized and existing under the laws of New York, with a registered office at 1200 RXR Plaza, Uniondale, New York 11556.

7.      Air Charter Service Georgia Inc. is a corporation organized and existing under the laws of Georgia, with a registered office at 1170 Peachtree Street, Suite 1200, Atlanta, Georgia 30309.

8.      The Travel Division Ltd. is a corporation organized and existing under the laws of New York, with a registered office at 1200 RXR Plaza, Uniondale, New York 11556.

9.      Air Charter Service Trucking Inc. is a corporation organized and existing under the laws of New York, with a registered office at 1200 RXR Plaza, Uniondale, New York 11556.

10.     The ACS entities are aircraft charter brokerage companies that act as binders for individuals or organizations ("charterers") to procure aircraft and transportation services from an aircraft operator, which the charterer then takes on charter from the operator.

11.     The ACS entities also provide their customers with travel concierge services, including but not limited to booking hotel accommodations and activities, ground transportation, and catering.

12.     Airbus is a corporation organized and existing under the laws of Alabama, with offices at 320 Airbus Way, Mobile, Alabama 36615, and its corporate headquarters is in Herndon, Virginia.

13.     Airbus is an aerospace company involved in the design, manufacture, and sale of, among other things, commercial aircraft.  Airbus continuously and systemically solicits and transacts business in New York, and entered into many of the Contracts that give rise to this action in New York.

14.     At all times relevant to this action, Mr. Avellanet was an employee of Airbus.

## JURISDICTION AND VENUE

15.     This Court has original jurisdiction over the subject matter pursuant to 28 U.S.C. § 1332(a)(1), as this is a civil action between citizens of the States of New York and Georgia and a citizen of the State of Alabama, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.     Venue is proper based on the express terms of the Contracts from which this dispute arises, in which the parties expressly agreed to submit to the jurisdiction of the courts of New York.

## FACTUAL BACKGROUND

### Contractual Relationship Between ACS and Airbus

17.     ACS and Airbus entered into a separate Booking Request ("Contract") for each transaction in which Airbus requested ACS's services for payment, which was detailed in an accompanying invoice.

18.     The Contracts were arms-length business transactions between two sophisticated commercial entities, Airbus and one of the ACS entities.

19.    The governing law paragraph of the Contracts states:

> This booking request and any disputes or claims arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and interpreted in accordance with New York law and the parties hereby agree and submit to the jurisdiction of the New York courts.

20.    The Contracts further state, in sum and substance:

> From: Airbus Americas Inc
>         320 Airbus Way
>         Mobile, AL 36615
>         United States of America

> I/We refer to our earlier discussions and now confirm that, subject always to the ability of ACS to confirm the following Flight(s) with [aircraft operator] upon the terms set out below, I shall be grateful if ACS will kindly book, on my/our behalf (or on behalf of the company or corporation for which I am acting), as my/our agent, the following Flight(s) (the "Flight(s)"): . . .

> I/We confirm the gross Charter Price to be USD [price], [] which I/we confirm shall be paid to ACS on or before [invoice due date]. . . . I/We shall pay the same to ACS within 5 days of receipt of ACS's invoice in respect thereof inclusive of any Value Added Tax or other tax or credit card charges or fees or any other charges that may be applicable. . . .

> Furthermore, I/We accept that 3rd party invoices, including but not limited to Wi-Fi invoices or any of the Charter Price exclusions contained in this Booking Request may be invoiced to ACS a considerable time after the Flight, I/We agree that any invoice relating to the Flight(s) shall be paid without dispute to ACS on demand notwithstanding any delay.

21.    The Contracts further state, in sum and substance:

> **Cancellation Charges**
> In addition, I/We accept that the following cancellation terms (or those of the operator, whichever are the higher) will apply and which we shall pay to ACS upon demand:

> 100% Of the total Charter Price with immediate effect

> [or 25% Of the total Charter Price with immediate effect
> 50% Of the total Charter Price if cancelled less than 28 days prior to departure

75% Of the total Charter Price if cancelled less than 14 days prior to departure
100% Of the total Charter Price if cancelled less than 07 days prior to departure]

[or 50% Of the total Charter Price with immediate effect
100% Of the total Charter Price if cancelled less than 07 days prior to departure]

The Charter Price does not include: any changes of itinerary as listed above, Aircraft de-icing (including on any positioning, depositioning or ferry leg(s)), any fuel surcharges levied by the operator, war risk insurance costs, additional crew proceedings and any additional landings, re-routes, demurrage or Flight(s) hours plus any additional catering order, use of internet, Wi-Fi or in-flight satellite telephone or ground transportation and royalties (if applicable).

In the event that any of the foregoing costs apply, I/We shall pay the same to ACS within 5 days of receipt of the invoice in respect thereof.

22.     The Contracts further state:

This booking request may be executed by (i) any individual or entity entering into this booking request as principal ("Principal"); (ii) an end customer ("End Customer"); or (iii) any individual or entity acting on behalf of an End Customer or Principal ("Agent") (hereinafter collectively referred to as the "Parties"). Where any of the Parties executes this booking request or otherwise makes payment or accepts an invoice from ACS, the applicable Parties hereinafter agree to be held jointly and severally liable for any breach of this booking request whether in contract or tort including any acts or omissions on behalf of any passenger utilising the Flight(s) services.

23.     Airbus has a long history of paying ACS for the services ACS provides to Airbus under their contracts.

24.     Included in this history are over 180 payments Airbus made to ACS based on charters and bookings on Airbus's account that were entered into contract by Airbus's agent and employee Mr. Avellanet.  Between August 2020 and May 2021, Airbus made full payment on over 180 ACS invoices that itemized accommodations and other expenses, such as charters for private jets and bookings for hotels, transportation, catering, and other amenities to be used by Mr. Avellanet, that were substantially similar to those accommodations and other expenses itemized in the ACS invoices that Airbus now refuses to pay and from which this action arises.

25.     Given this longstanding history of proper payment from Airbus to ACS for similar invoiced expenses and the contractual relationship between ACS and Airbus, ACS reasonably understood Mr. Avellanet as having continued authority to enter into, and bind Airbus to, the Contracts at issue in this action.

***Employment and Agency Relationship Between Airbus and Mr. Avellanet***

26.     At all times relevant to this action, Mr. Avellanet was employed by Airbus as Airbus's Senior Logistics Transport Manager at Airbus's Final Assembly Line Manufacturing Facility in Mobile, Alabama.

27.     Mr.   Avellanet   communicated   with   ACS   via   his   email   address "carlos.avellanet@airbus.com[,]" and his emails included the following signature block:

> *Airbus AMBER*
> *Carlos AVELLANET*
> Sr. Logistics Transport Manager
> HO A320 Logistics
> SCL FAL USA – AALC
> *Final Assembly Line USA*
> T +1 251 439 4115
> M +1 850 902 6919
> E Carlos.Avellanet@airbus.com
> *Airbus Americas, Inc.*
> 320 Airbus Way
> Mobile, AL 36615

28.     On multiple occasions, Mr. Avellanet sent the following automated "Out of Office" email response to ACS's emails:

> I am currently on PTO returning to office [date]. For urgent shipment questions   please   contact   DHL   4PL   or   Scott   Simmons (Scott.Simmons@airbus.com).  I will answer upon my return.

29.     ACS addressed all of its invoices, relevant to this action, to either:

> Airbus Americas, Inc
> 320 Airbus Way
> Mobile, AL 36615
>
> or

> Airbus Americas, Inc.
> Accounts Payable Department,
> 2550 Wasser Terrace #9100
> Herndon, VA 20171

30.     Mr. Avellanet placed his signature or his initials ("CAA") on all of Airbus's

Contracts with ACS.  Mr. Avellanet's signature on the Contracts appeared in the following format:

> Signature: [Mr. Avellanet's e-signature]
> Name: Carlos Avellanet
> Company: Airbus Americas Inc

31.     Mr. Avellanet's signature and signature block on the Contracts show that Mr.

Avellanet entered into the Contracts as Airbus's agent, *i.e.*, as an "individual or entity acting on

behalf of an End Customer or Principal ('Agent')."  Again, the Contracts state:

> From: Airbus Americas Inc
>         320 Airbus Way
>         Mobile, AL 36615
>         United States of America

> . . . I shall be grateful if ACS will kindly book, on my/our behalf (or on behalf
> of the company or corporation for which I am acting), as my/our agent, the
> following Flight(s) (the "Flight(s)"): …

> This booking request may be executed by (i) any individual or entity entering
> into this booking request as principal ("Principal"); (ii) an end customer
> ("End Customer"); or (iii) any individual or entity acting on behalf of an End
> Customer or Principal ("Agent") (hereinafter collectively referred to as the
> "Parties").

***Contracts Entered Into Between ACS and Airbus Via Mr. Avellanet***

32.     Airbus—through its employee and agent Mr. Avellanet—entered into over fifty

Contracts with ACS from 2020 to 2022 to charter private jets or similar aircraft and to book hotel

accommodations, ground transportation, catering on board the aircraft and dining at destinations,

gift cards for use at destinations, event tickets at destinations, and other travel amenities.

33.     On or around June 18, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's

account two suites with bed and breakfast at the Embassy Suites by Hilton Atlanta at Centennial

Olympic Park in Atlanta, Georgia ("Embassy Suites – Atlanta") for one night on June 18, 2021 for

himself and guests.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. In connection with this Contract, ACS generated Invoice No. 4764 in the amount of $1,026. Payment was due on August 17, 2021.  Airbus has not made payment on this invoice.

34.     On or around June 21, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account three executive rooms with bed and breakfast and one deluxe room with bed and breakfast at the JW Marriott Los Angeles L.A. LIVE in Los Angeles, California for two nights starting on June 25, 2021 for himself and guests.  Mr. Avellanet also requested spa treatments at the hotel and requested eight tickets for seats at the NBA West Conference Finals, Game 4: Suns at Clippers. Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 4772 in the amount of $19,852.35.  Payment was due on August 20, 2021.  Airbus has not made payment on this invoice.

35.     On or around June 21, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account four suites with bed and breakfast at the Embassy Suites – Atlanta for one night on June 27, 2021 for himself and guests.  Mr. Avellanet also requested eight tickets for seats at the NBA East Conference Finals, Game 3: Bucks at Hawks.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 4772 in the amount of $17,371.70.  Payment was due on August 20, 2021.  Airbus has not made payment on this invoice.

36.     On June 2, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account two oceanfront rooms at the Sheraton Waikiki in Honolulu, Hawaii for eight nights starting on June 28, 2021 for six individuals.  Mr. Avellanet also requested six Delta Airlines tickets from Atlanta Hartsfield International Airport in Atlanta, Georgia to Honolulu International Airport in Honolulu, Hawaii.  Mr. Avellanet also requested a car rental for eight days from Sixt Car Rental ("Sixt"). Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or

apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice Nos. 4671 and 4723 in the amount of $47,062.30.  Payment was due on August 27 2021.  Airbus has not made payment on these invoices.

37.     On or around July 5, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account three rooms with bed and breakfast at the Hilton Garden Inn Phoenix Downtown in Phoenix, Arizona for two nights starting on July 7, 2021 for himself and guests.  Mr. Avellanet also requested four tickets for seats to the NBA West Conference Finals, Game 2: Bucks at Suns. Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 4786 in the amount of $20,428.00.  Payment was due on September 5, 2021.  Airbus has not made payment on this invoice.

38.     On or around July 22, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account six premium rooms at the IP Casino Resort Spa Biloxi in Biloxi, Mississippi for one night on July 24, 2021.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 4823 in the amount of $3,876.00. Payment was due on September 22, 2021.  Airbus has not made payment on this invoice.

39.     On or around July 13, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on July 22, 2021 from Mobile Downtown Airport in Mobile Alabama ("BFM") to Luis Muñoz Marín International Airport in Carolina, Puerto Rico ("SJU") and returning on July 25, 2021 for himself and guests.  Mr. Avellanet also requested catering from Dicky's BBQ and Prohibas restaurants, alcohol, and ground transportation.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 53429 in the amount of $9,455.00. Payment was due on October 21, 2021.  Airbus has not made payment on this invoice.

40.     On or around March 9, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account four premier bay view suites with bed and breakfast at the Mandarin Oriental Miami in Miami, Florida ("Mandarin – Miami") for two nights starting on August 20, 2021 for himself and guests.  Mr. Avellanet also requested spa treatments at the hotel.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice Nos. 4964 and 5301 in the amount of $5,661.68.  Payment was due on October 19, 2021. Airbus has not made payment on these invoices.

41.     On or around August 2, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account one beach front suite with bed and breakfast at the Hilton Sandestin Beach Golf Resort & Spa in Miramar Beach, Florida for one night on September 2, 2021.  Mr. Avellanet also requested spa treatments at the hotel and dining reservations for sixteen guests at Segars restaurant.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 5264 which has a remaining balance of $5,446.81.  Payment was due on October 28, 2021.  Airbus has not made full payment on this invoice.

42.     On or around April 23, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on September 30, 2021 from Pensacola Aviation Center in Pensacola, Florida to Cutter Aviation in Phoenix, Arizona and returning on October 4, 2021.  Mr. Avellanet also requested catering from Chik-Fil-A and Modern Tortilla restaurants and ground transportation.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 53752 in the amount of $9,019.31.  Payment was due on June 22, 2022.  Airbus has not made payment on this invoice.

43.     On or around September 13, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account seven balcony suites with bed and breakfast at the Hilton Sedona Resort at Bell

Rock in Sedona, Arizona for four nights starting on September 30, 2021 for "Airbus guests[,]" as noted on the Invoice No. 5100.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 5100 in the amount of $15,930.32.  Payment was due on November 29, 2021.  Airbus has not made payment on this invoice.

44.     On or around October 1, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account one junior suite with bed and breakfast at the Hotel Café Royal in London, England and one executive room with bed and breakfast at the Paris Marriott Opera in Paris, France for five nights each starting on October 3, 2021 and October 9, 2021, respectively.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 5265 in the amount of $10,845.  Payment was due on December 5, 2021.  Airbus has not made payment on this invoice.

45.     On or around September 13, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on October 7, 2021 from Bob Sikes Airport in Crestview, Florida ("CEW") to McCarran International Airport in Las Vegas, Nevada ("LAS") and returning on October 11, 2021 for himself and guests.  Mr. Avellanet also requested ground transportation.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice Nos. 701 and 716 in the amount of $93,507.00 and $2,176.75, respectively.  Payments were due on November 25, 2021 and December 29, 2021, respectively.  Airbus has not made payment on these invoices.

46.     On or around September 20, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account six fountain view rooms with bed and breakfast at the Bellagio in Las Vegas, Nevada for four nights starting on October 7, 2021 for himself and guests.  Mr. Avellanet also requested six fireball gift baskets; a pool cabana; spa treatments at the hotel; dining reservation for

fourteen guests at Bacchanal Buffet restaurant; dining reservation for fifteen guests at Yellowtail Japanese restaurant; a birthday cake; and fourteen tickets for seats at the World Heavyweight Championship, Fury versus Wilder boxing match. Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. In connection with this Contract, ACS generated Invoice No. 5259 in the amount of $52,246.06. Payment was due on December 5, 2021. Airbus has not made payment on this invoice.

47.     On or around October 14, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on October 22, 2021 from CEW to Orlando International Airport in Orlando, Florida and returning on October 24, 2021. Mr. Avellanet also requested catering and ground transportation. Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. In connection with this Contract, ACS generated Invoice Nos. 720, 714, and 715 in the amount of $2,544.46, $19,495.00, and $18,490.00, respectively. Payments were due on December 31, 2021, December 22, 2021, and December 22, 2021, respectively. Airbus has not made payment on these invoices.

48.     On or around October 21, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account four rooms with bed and breakfast at the Hilton Orlando in Orlando, Florida for two nights starting on October 22, 2021. Mr. Avellanet also requested four two-day unlimited express tickets for Universal Orlando Resort and four tickets for Halloween Horror Nights at Universal Orlando Resort. Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. In connection with this Contract, ACS generated Invoice No. 5267 in the amount of $6,522.84. Payment was due on December 21, 2021. Airbus has not made payment on this invoice.

49.     On or around October 25, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on October 29, 2021 from CEW to Dekalb-Peachtree Airport in Dekalb, Georgia ("PDK") and returning on October 31, 2021 for

himself and guests.  Mr. Avellanet also requested catering and ground transportation.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice Nos. 724 and 739 in the amount of $54,355.00 and $3,061.92, respectively.  Payments were due on January 12, 2022 and February 2, 2022, respectively.  Airbus has not made payment on these invoices.

50.    On or around October 25, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account two city view suites with bed and breakfast at The Candler Hotel Atlanta, Curio Collection by Hilton, Atlanta in Atlanta, Georgia for two nights starting on October 29, 2021 for himself and guests.  Mr. Avellanet also requested four tickets for Delta Sky seats at the MLB World Series, Game 4: Astros at Braves. Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 5268 in the amount of $39,854.11.  Payment was due on December 28, 2021.  Airbus has not made payment on this invoice.

51.    On or around October 15, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on November 4, 2021 from CEW to Miami Opa-Locak Executive Airport in Miami-Dade, Florida and returning on November 7, 2021. Mr. Avellanet also requested ground transportation.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice Nos. 53341 and 53758 in the amount of $56,000.00 and $6,269.25, respectively.  Payments were due on January 5, 2022 and February 6, 2022, respectively.  Airbus has not made payment on these invoices.

52.    On or around October 20, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account four premier bay view suites with bed and breakfast at the Mandarin – Miami for three nights starting on November 4, 2021 for himself and guests.  Mr. Avellanet also requested

spa treatments at the hotel.  Mr. Avellanet also requested eight tickets for seats at the NBA Eastern Conference game: Celtics at Heat.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice Nos. 5269 and 5576 in the amount of $24,340.66.  Payment was due on January 3, 2022.  Airbus has not made payment on these invoices.

53.     On or around November 8, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on November 20, 2021 from Pensacola International Airport in Pensacola, Florida ("PNS") to Grantley Adams International Airport in Seawell, Christ Church, Barbados ("BGI") and returning on November 24, 2021 for himself and a guest.  Mr. Avellanet also requested catering and ground transportation.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice Nos. 53659 and 54021 in the amount of $115,724.00 and $2,358.08, respectively.  Payments were due on January 20, 2022.  Airbus has not made payment on these invoices.

54.     On or around November 8, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account one Skypool Butler suite with beachfront views, a balcony tranquility soaking tub, and all-inclusive meal plans at the Sandals Resort in St. Lawrence Gap, Barbados for four nights starting on November 20, 2021 for himself and a guest.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 5273 in the amount of $12,946.40.  Payment was due on January 19, 2022.  Airbus has not made payment on this invoice.

55.     On or around November 30, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account thirty platinum tower gulf view rooms at the Hard Rock Hotel in Biloxi, Mississippi.  Mr. Avellanet also requested dining reservations for forty-five guests at Sal &

Mookie's restaurant for "Airbus's Christmas party[,]" as noted on Invoice No. 5575.   Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.   In connection with this Contract, ACS generated Invoice No. 5575 in the amount of $22,937.70.   Payment was due on February 14, 2022.   Airbus has not made payment on this invoice.

56.     On or around March 26, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on December 23, 2021 from BFM to Kahului Airport in Kahului, Hawaii and returning on December 30, 2021.   Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.   In connection with this Contract, ACS generated Invoice No. 743 in the amount of $56,225.00.   Payment was due on February 28, 2022. Airbus has not made payment on this invoice.

57.     On or around May 18, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account three luxury deluxe ocean view rooms at the Ho'olei at Grand Wailea in Honolulu, Hawaii for December 2021.   Mr. Avellanet also requested two cars from Sixt.   Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.   In connection with this Contract, ACS generated Invoice No. 4748 in the amount of $68,868.57.   Payment was due on May 19, 2022.   Airbus has not made payment on this invoice.

58.     On or around December 10, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on December 30, 2021 from CEW to Tererboro Airport in Tererboro, New Jersey and returning on January 2, 2022.   Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.   In connection with this Contract, ACS generated Invoice Nos. 50422 and 54001 in the amount of $48,995.00 and $44,745.00, respectively.   Payments were due on February 28, 2022 and March 2, 2022, respectively.   Airbus has not made payment on these invoices.

59.     On or around October 26, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on January 9, 2022 from CEW to Indianapolis International Airport in Indianapolis, Indiana and returning on January 11, 2022.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 53519 in the amount of $46,000.00.  Payment was due on March 8, 2022.  Airbus has not made payment on this invoice.

60.     On or around October 26, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on January 28, 2022 from CEW to PDK and returning on January 30, 2022.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 53520 in the amount of $48,975.00.  Payment was due on March 8, 2022.  Airbus has not made payment on this invoice.

61.     On or around March 15, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on February 3, 2022 from PNS to LAS and returning on February 7, 2022 for sixteen passengers.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 51108 in the amount of $83,437.50.  Payment was due on April 3, 2022.  Airbus has not made payment on this invoice.

62.     On or around December 10, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on February 18, 2022 from PNS to St. Georges Maurice Bishop International Airport in St. Georges, Grenada and returning on February 23, 2022.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.

In connection with this Contract, ACS generated Invoice No. 757 in the amount of $118,213.00. Payment was due on April 25, 2022.  Airbus has not made payment on this invoice.

63.     On or around April 2, 2021, ACS, at Mr. Avellanet's request, arranged for a private charter on Airbus's account for a roundtrip departing on April 1, 2022 from CEW to SJU and returning on April 9, 2022.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. In connection with this Contract, ACS generated Invoice No. 617 in the amount of $86,000.00. Payment was due on June 1, 2022.  Airbus has not made payment on this invoice.

64.     On or around October 20, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account accommodations at the London Mandarin Oriental in London, England for seven nights in July 2022 for himself and a guest.  Mr. Avellanet also requested and two airline tickets from Pensacola, Florida to London, England and spa treatments at the hotel.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 5271 in the amount of $31,740.00.  Payment was due on February 14, 2022. Airbus has not made payment on this invoice.

65.     On or around July 30, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account accommodations at Disney's Art of Animation Resort in Lake Buena Vista, Florida.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 4625 in the amount of $10,065.72.  Payment was due on April 28, 2022.  Airbus has not made payment on this invoice.

66.     On or around June 2, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account accommodations on the Royal Caribbean International Cruise in Miami, Florida for seven nights starting on July 2, 2022.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with

Airbus.  In connection with this Contract, ACS generated Invoice No. 4746 in the amount of $30,848.00.  Payment was due on August 31, 2022.  Airbus has not made payment on this invoice.

67.     On or around December 21, 2020, ACS, at Mr. Avellanet's request, booked on Airbus's account airline tickets for travel from Pensacola, Florida and Atlanta, Georgia, to Dubai, United Arab Emirates and Bangkok, Thailand, back to Pensacola, Florida for himself and a guest. Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  In connection with this Contract, ACS generated Invoice No. 4630 in the amount of $1,260 in change fees for new flights. Payment was due on April 28, 2021.  Airbus has not made payment on this invoice.

68.     On or around October 21, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account a truck to transport cargo, *i.e.*, a golf cart and a generator, from Airbus Americas, Inc., at 320 Airbus Way, Mobile, Alabama 36615, to Tellus Storage at 200 Bryars Lane, Spanish Fort, Alabama 36527.  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. In connection with this Contract, ACS generated Invoice No. 305 in the amount of $1,124.82. Airbus has not made payment on this invoice.

69.     The above-mentioned instances are not exhaustive of all outstanding ACS invoices that Airbus has refused to pay.

70.     Additionally, on or around September 23, 2020, ACS, at Mr. Avellanet's request, purchased on Airbus's account three $500 gift cards and two $250 for Disney World because, as Mr. Avellanet stated, "[w]e want to do a giveaway / raffle this weekend while at Disney amongst the teams / suppliers that are there."  Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus.  Airbus made full and timely payment for these expenses under the Contract.

71.     On or around November 16, 2020, ACS, at Mr. Avellanet's request, purchased on Airbus's account four $500 gift cards for Disney World because, as Mr. Avellanet stated, "Again i [sic] am in charge of the raffle/give away . . . ." Mr. Avellanet entered into this Contract on

Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. Airbus made full and timely payment for these expenses under the Contract.

72.     On or around April 8, 2021, ACS, at Mr. Avellanet's request, purchased on Airbus's account six $500 gift cards for Disney World because, as Mr. Avellanet stated, "I would like to raffle $3000 with the number of attendees ( 6x$500)." Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. Airbus made full and timely payment for these expenses under the Contract.

73.     On or around October 26, 2020, ACS, at Mr. Avellanet's request, booked on Airbus's account roundtrip first class American Airlines tickets from PNS to Phoenix, Arizona departing on November 5, 2020 and returning on November 8, 2020. In his email to ACS, Mr. Avellanet stated: "Trip Reason: Women in Aviation Conf (can you make sure that's on the invoice somewhere?)" Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. Airbus made full and timely payment for these expenses under the Contract.

74.     On or around August 3, 2021, ACS, at Mr. Avellanet's request, booked on Airbus's account a truck to transport cargo from Pensacola Aviation Center to Atlanta Shine, an auto detailing, car wash, and car window tinting shop. Mr. Avellanet made this request via an email which had the subject line: "Airbus request." Mr. Avellanet entered into this Contract on Airbus's behalf as an agent of Airbus with actual and/or apparent authority, and/or in the scope of his employment with Airbus. Airbus made full and timely payment for these expenses under the Contract.

*Mr. Avellanet's Material Misrepresentations and Omissions to ACS*

75.     Mr. Avellanet reassured ACS on multiple occasions that he had authority to make bookings on behalf of Airbus and that his personal bookings on Airbus's account with ACS were approved by Airbus.

76.     On May 19, 2021, ACS asked Mr. Avellanet via email if it was "the case that Airbus give[s] you a personal budget for trips?" and Mr. Avellanet replied: "Yep! Only through negotiations on employment conditions, but I get an allowance per year. Sometimes, the value is too high and in those cases, Airbus pays ACS and I pay Airbus back the 'overage' amount."

77.     On February 10, 2020, Mr. Avellanet told ACS via email: "Just quick payment update, my CFO signed off on the emergency transfer."

78.     On April 21, 2020, Mr. Avellanet told ACS via email: "PS, I need to move our text group. Airbus has begun banning texts about *company business*" (emphasis added).

79.     On June 11, 2012, ACS asked Mr. Avellanet via email if he "would [] like this [invoice] to be taken off of [his] 2021 balance?" and Mr. Avellanet replied: "That's fine.  I'll clarify internally how to handle later."

80.     On November 8, 2021, ACS asked Mr. Avellanet about unpaid invoices and Mr. Avellanet replied: "[J]ust leaving my finance office, currently planned to pay all on the next run but its [sic] is not until end of month."

81.     On December 2, 2021, ACS asked Mr. Avellanet about unpaid invoices and Mr. Avellanet replied: "I just requested a copy of the payment details to be sent to you and the jet guys, it looks like its [sic] going out today :)[.]"

***Airbus's Misleading Statements to and Conduct toward ACS Regarding Mr. Avellanet's Authority to Enter Contracts on Its Behalf and on Its Account***

82.     In addition to Mr. Avellanet's express statements that Airbus would pay ACS's invoices, Airbus did make payments—in the total amount of $2,368,930.00—to ACS for over 180 invoices that contained similar expenses as those described in the above paragraphs 33-68 from 2020 to 2022.

83.     For example, on or around November 24, 2020, Airbus paid ACS for ACS Invoice No. 4238 in the amount of $2,200 for Disney gift cards.  Airbus neither questioned the expenses itemized on this invoice nor alerted ACS to any wrongdoing by Mr. Avellanet.  Airbus's conduct

effectively ratified Mr. Avellanet's actions, granted him authority to enter into contracts with ACS on behalf of Airbus and on Airbus's account, and allowed ACS to reasonably infer that Airbus granted the authority to Mr. Avellanet to enter into contracts on Airbus's behalf, and further that the actions Avellanet took were within the scope of his apparent authority.

84.    As another example, on or around April 30, 2021, Airbus paid ACS for ACS Invoice No. 4638 in the amount of $47,682.33 for hotel accommodations at the Mandarin – Miami and tickets for seats at the NBA Eastern Conference game: 76ers at Heat.  Airbus neither questioned the expenses itemized on this invoice nor alerted ACS to any wrongdoing by Mr. Avellanet.  Airbus's conduct effectively ratified Mr. Avellanet's actions, granted him authority to enter into contracts with ACS on behalf of Airbus and on Airbus's account, and allowed ACS to reasonably infer that Airbus granted the authority to Mr. Avellanet to enter into contracts on Airbus's behalf, and further that the actions Avellanet took were within the scope of his apparent authority.

85.    Further, on May 27, 2020, ACS sent an email to "na_accounts.payable@airbus.com" and Mr. Avellanet, stating: "I've attached the invoice for your recent charter under PO 3500004740, MSN 10009.  If you have any questions or require any additional information, please let me know."    In response to ACS's email to "na_accounts.payable@airbus.com" and Mr. Avellanet, Airbus employee Omayra Callejas ("Ms. Callejas") confirmed to ACS that Mr. Avellanet's request was authorized by Airbus's accounting department.    On June 1, 2020, Ms. Callejas, whose email address was "omayra.callejas@airbus.com" and whose title was "Accounts Payable Analyst[,]" emailed ACS, stating: "Please revise this invoice to reflect the correct PO number."

86.    Airbus employee Nigel Hewlett ("Mr. Hewlett") also confirmed that certain of Mr. Avellanet's requests were authorized.  On July 12, 2021, Mr. Hewlett, whose email address was "nigel.hewlett@airbus.com[,]" emailed ACS, stating: "In addition to the request made by Carlos [Avellanet] ref. the group visit 28th (for which I will be a part of) I would like to plan a focused visit to Padgett on the Monday 26th to physically see its progress . . . ."

87.    On December 8, 2021, an Airbus employee, whose email address was "faltransport.invoices@airbus.com" and whose title was "Accounts Payable Analyst[,]" emailed ACS and Mr. Avellanet, stating: "Hi both, Sorry for the delay – we have now solved a system output issued we have been seeing but EU has now resolved.  Please acknowledge receipt so I know it's now working."

88.    Airbus's conduct effectively ratified Mr. Avellanet's actions, granted him authority to enter into contracts with ACS on behalf of Airbus and on Airbus's account, and allowed ACS to reasonably infer that Airbus granted the authority to Mr. Avellanet to enter into contracts on Airbus's behalf, and further that the actions Avellanet took were within the scope of his apparent authority.

***Airbus's Refusal to Continue Making Payments on ACS Invoices***

89.    On December 15, 2021, Mr. Avellanet passed away.

90.    Following Mr. Avellanet's death, Airbus refused to make payments on the remaining ACS invoices for the Contracts between Airbus and ACS.

91.    Following Mr. Avellanet's death, ACS has been diligently attempting to cancel the bookings it made on Airbus's account in an effort to receive refunds of its already-made payments to third parties, including but not limited to aircraft operators, hotels, caterers, and car rentals.

92.    Despite ACS's mitigation efforts, as a result of Airbus's refusal to pay ACS on the remaining invoices, ACS has sustained approximately $1,492,536.56 in damages from unpaid invoices and additional damages for lost profits, business interruption, and associated costs, fees (including but not limited to attorney fees), interest, and expenses.

**FIRST CAUSE OF ACTION**
**BREACH OF CONTRACT**

93.    ACS repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 92 as if fully set forth herein.

94.    ACS and Airbus are parties to the Contracts, which are valid and enforceable under New York law and public policy.

95.     Airbus entered into the Contracts by its agent and employee Mr. Avellanet.

96.     At all times relevant to this action, Mr. Avellanet was the agent and employee of Airbus, as evident by Mr. Avellanet's email address, signature block, automated "Out of Office" response that directed emails to a fellow Airbus colleague, and initials and signatures on behalf of Airbus on the Contracts, among other things.

97.     Airbus communicated to ACS, through its words and conduct, that its agent Mr. Avellanet possessed the authority to enter into transactions with its account and on its behalf.

98.     Specifically, Airbus made payments to ACS on over 180 invoices that contained similar expenses, *i.e.*, transactions entered into on its behalf by Mr. Avellanet, on its account. Airbus's repeated approval and ratification of the transactions clearly implied to any reasonable third party, including ACS, that Mr. Avellanet had authority to enter into those transactions.

99.     ACS sent invoices to Airbus's accounting department via email and Airbus's Accounts Payable Analysts responded without questioning the invoiced items or amounts.  This ratification of the requests made by Mr. Avellanet on Airbus's account gave ACS the reasonable belief that Mr. Avellanet had Airbus's approval to enter into these transactions with Airbus's account and on Airbus's behalf.

100.     Further, Mr. Hewlett, an Airbus employee, stated in an email to ACS that he had additional requests "[i]n addition to the request made by Carlos [Avellanet] . . ." which is a statement that would reasonably convince any third party, including ACS, that Airbus authorized Mr. Avellanet to make requests with its account and on its behalf.

101.     The Contracts, which Mr. Avellanet signed as "Company: Airbus Americas Inc", provide that Mr. Avellanet "shall be grateful if ACS will kindly book, on my/our behalf (or on behalf of the company or corporation for which I am acting, as my/our agent, the following Flight(s) . . . ."

102.     The Contracts, which Mr. Avellanet signed as "Company: Airbus Americas Inc", further provide that "[t]his booking request may be executed by . . . or any individual or entity acting on behalf of an End Customer or Principal ("Agent") (hereinafter collectively referred to as

the "Parties"). *Where any of the Parties executes this booking request or otherwise makes payment or accepts an invoice from ACS, the applicable Parties hereinafter agree to be held jointly and severally liable for any breach of this booking request whether in contract or tort including any acts or omissions on behalf of any passenger utilising the Flight(s) services*" (emphasis added).

103.    ACS fulfilled its obligations under the Contracts by providing its aircraft chartering, travel concierge, and trucking services.

104.    By reason of the foregoing, Airbus has become indebted to ACS in the approximate sum of $1,492,536.56, which Airbus refuses to pay.

105.    Airbus is in breach of the Contracts in that it has failed to make payment of approximately $1,492,536.56 which is due and owing under the Contracts and their relevant invoices.

106.    The figure of $1,492,536.56 includes a reasonable estimation of ACS's losses due to Airbus's unjustified failure to pay the invoiced amounts for completed charters and bookings, pursuant to the terms of the Contracts.

107.    The Contracts, which Mr. Avellanet signed as "Company: Airbus Americas Inc", provide, in sum and substance, that "I/[w]e confirm the gross Charter Price to be USD [price], [] which I/we confirm shall be paid to ACS on or before [invoice due date] . . . . I/We shall pay the same to ACS within 5 days of receipt of ACS's invoice in respect thereof inclusive of any Value Added Tax or other tax or credit card charges or fees or *any other charges* that may be applicable. . . ." (emphasis added).

108.    The Contracts which Mr. Avellanet signed as "Company: Airbus Americas Inc", further provide that "I/[w]e accept that 3rd party invoices, including but not limited to Wi-Fi invoices or any of the other Charter Price exclusions contained in this Booking Request may be invoiced to ACS a considerable time after the Flight, I/[w]e agree that any invoice relating to the Flight(s) shall be paid without dispute to ACS on demand notwithstanding any delay."

109.    The figure of $1,492,536.56 includes a reasonable estimation of ACS's losses due to Airbus's unjustified failure to pay the invoiced amounts for cancelled charters and bookings, pursuant to the terms of the Contracts.

110.    The Contracts which Mr. Avellanet signed as "Company: Airbus Americas Inc", further provide, in sum and substance, that "I/[w]e accept that the following cancellation terms (or those of the operator, whichever are the higher) will apply and which we shall pay to ACS upon demand: 100% Of the total Charter Price with immediate effect [or 25% Of the total Charter Price with immediate effect, 50% Of the total Charter Price if cancelled less than 28 days prior to departure, 75% Of the total Charter Price if cancelled less than 14 days prior to departure, 100% Of the total Charter Price if cancelled less than 07 days prior to departure; or 50% Of the total Charter Price with immediate effect, 100% Of the total Charter Price if cancelled less than 07 days prior to departure] . . . ."

111.    As a direct and proximate result of Airbus's breach of contract, ACS has sustained damages for unpaid invoices, lost profits, business interruption, and associated costs in an amount to be determined at trial.

112.    Accordingly, Airbus is liable for breach of contract under the theory of actual and/or apparent authority.

**SECOND CAUSE OF ACTION**
**FRAUDULENT INDUCEMENT**

113.    ACS repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 112 as if fully set forth herein.

114.    A fraud claim may arise out of the same set of facts as a breach of contract claim and "[b]oth claims will lie when a plaintiff can show . . . a fraudulent misrepresentation collateral or extraneous to the contract . . . ." *Vorcom Internet Servs., Inc. v. L & H Eng'g & Design LLC*, No. 12-CV-2049 (VB), 2013 WL 335717, at *4 (S.D.N.Y. Jan. 9, 2013) (citing *Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 20 (2d Cir. 1996)).   Here, in

paragraphs 116-24 and 138-46, ACS has alleged several fraudulent misrepresentations by Mr. Avellanet, as an agent and employee of Airbus, that are collateral or extraneous to the Contracts.

115.    On numerous occasions (as described with specificity in paragraphs 76-81), Mr. Avellanet, acting as the agent and employee of Airbus, expressly stated to ACS material misrepresentations or omissions of fact that he knew to be false with the intent to defraud ACS, who reasonably relied on such misrepresentations or omissions and, as a result, sustained damages.

116.    On May 19, 2021, when ACS sought to confirm whether Airbus gave their employees a personal budget for trips, Mr. Avellanet replied, via email, in the affirmative: "Yep! Only through negotiations on employment conditions, but I get an allowance per year. Sometimes, the value is too high and in those cases, Airbus pays ACS and I pay Airbus back the 'overage' amount."

117.    Mr. Avellanet knew this was a material misrepresentation that did not accurately reflect Airbus's employee benefit program, but he purposefully stated it to convince ACS that his bookings were approved by Airbus, which was a reasonable concept given Mr. Avellanet's Airbus email address and title and because Airbus had paid prior ACS invoices that contained similar expenses on its account.

118.    On June 11, 2021, when ACS asked Mr. Avellanet whether he would like an invoice to be taken off the 2021 balance, Mr. Avellanet replied, via email: "That's fine. I'll clarify internally how to handle later."

119.    Mr. Avellanet knew this was a material misrepresentation or omission that did not accurately portray the actual circumstances because he would not be informing Airbus of this transaction.  Mr. Avellanet intentionally worded his email in a way to convince ACS that Airbus was involved in the processing and accounting of his bookings, which was a reasonable concept given Mr. Avellanet's past reassurances on Airbus's finance department and CFO's participation, such as when he stated, via email, to ACS: "[j]ust leaving my finance office, currently planned to pay all on the next run but its [sic] is not until end of month" on November 8, 2021; "[j]ust quick payment update, my CFO signed off on the emergency transfer" on February 10, 2020; and "PS, I

need to move our text group. Airbus has begun banning texts about *company business*" (emphasis added) on April 21, 2020.

120.    On October 26, 2020, Mr. Avellanet asked ACS to "make sure ["Trip Reason: Women in Aviation Conf"] [is] on the invoice somewhere" for roundtrip first class American Airlines tickets from PNS to Phoenix Arizona, departing on November 5, 2020 and returning on November 8, 2020.

121.    Mr. Avellanet knew this reason for booking the airline tickets was a material misrepresentation because there was no "Women in Aviation Conf[erence]" on or around November 2020 in Phoenix, Arizona.  Women in Aviation International held their 2020 conference in Orlando, Florida from March 5-7, 2020.  International Aviation Women's Association held their 2020 conference virtually from October 13-15, 2020.  Mr. Avellanet purposefully made this request with the intention of defrauding ACS into relying on his assertions that the booking was made in connection with an Airbus-approved reason.  ACS's reliance on Mr. Avellanet's reassurances was reasonable because of Mr. Avellanet's repeated misrepresentations and omissions regarding his use of Airbus's account with ACS.

122.    As additional examples of Mr. Avellanet's deceitful behavior and intent, on or around September 23, 2020, November 16, 2020, and April 8, 2021, Mr. Avellanet requested ACS purchase multiple $500 gift cards for Disney World because "[w]e want to do a giveaway / raffle this weekend while at Disney amongst the teams /suppliers that are there."

123.    Mr. Avellanet knew this was a material misrepresentation that made it appear the gift cards would be used to reward or encourage business among Airbus's teams and suppliers when in actuality the gift cards would be used by his family and friends.

124.    Further, on August 3, 2021, Mr. Avellanet made an "Airbus request" that ACS book a truck to transport cargo from Pensacola Aviation Center to Atlanta Shine, an auto detailing, car wash, and car window tinting shop.  Labeling this request to move what is likely a personal car as an "Airbus request" is a material misrepresentation made with the intent to deceive ACS into thinking the request was approved by Airbus.

125.    Mr. Avellanet's repeated misrepresentations that Airbus approved of, and would pay, ACS's invoices shows that Mr. Avellanet never intended to pay ACS for the charters and bookings under the Contracts.

126.    Mr. Avellanet's repeated misrepresentations that Airbus approved of, and would pay, ACS's invoices shows that Mr. Avellanet's representations or omissions were made with the intention of inducing ACS's reliance and forcing ACS into executing the Contracts with Airbus.

127.    ACS's reliance on Mr. Avellanet's misrepresentations and omissions was reasonable given Airbus had already paid ACS $2,368,930.00 for over 180 invoices that contained similar expenses on its account, and Mr. Avellanet's fraudulent conduct took place at Airbus's offices and through the use of Airbus's resources, *e.g.*, Airbus's email address, Airbus's account with ACS, and Airbus's name and goodwill.

128.    Mr. Avellanet's misrepresentations and omissions caused ACS's damages, in that ACS rendered its services to charter aircraft and to book hotel accommodations, ground transportation, catering on board the aircraft and dining at destination, gift cards for use at destination, event tickets at destination, and other travel services—all without payment from Airbus.

129.    At all times relevant to this action, Mr. Avellanet was the agent and employee of Airbus, as evident by Mr. Avellanet's email address, signature block, automated "Out of Office" response that directed emails to a fellow Airbus colleague, and initials and signatures on behalf of Airbus on the Contracts, among other things.

130.    Airbus communicated to ACS, through its words and conduct, that its agent Mr. Avellanet possessed the authority to enter into transactions with its account and on its behalf.

131.    Specifically, Airbus made payments to ACS on over 180 invoices that contained similar expenses on its account, *i.e.*, transactions entered into on its behalf by Mr. Avellanet. Airbus's repeated approval and ratification of the transactions clearly implied to any reasonable third party, including ACS, that Mr. Avellanet had authority to enter into those transactions.

132.    ACS sent invoices to Airbus's accounting department via email and Airbus's Accounts Payable Analysts responded by paying without questioning the invoiced items or amounts.  This ratification of the requests made by Mr. Avellanet on Airbus's account gave ACS the reasonable belief that Mr. Avellanet had Airbus's approval to enter into these transactions with Airbus's account and on Airbus's behalf.

133.    Further, Mr. Hewlett, an Airbus employee, stated in an email to ACS that he had additional requests "[i]n addition to the request made by Carlos [Avellanet] . . ." which is a statement that would reasonably convince any third party, including ACS, that Airbus authorized Mr. Avellanet to make requests with its account and on its behalf.

134.    ACS reasonably relied on Mr. Avellanet's material misrepresentations and omissions because of Airbus's misleading statements and conduct that showed Airbus had given Mr. Avellanet authority to enter into transactions on Airbus's account and on Airbus's behalf.

135.    Accordingly, Airbus is liable under the theory of apparent authority for the fraudulent conduct of its agent and employee Mr. Avellanet.

## THIRD CAUSE OF ACTION
## <u>FRAUDULENT INDUCEMENT</u>

136.    ACS repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 135 as if fully set forth herein.

137.    A fraud claim may arise out of the same set of facts as a breach of contract claim and "[b]oth claims will lie when a plaintiff can show . . . a fraudulent misrepresentation collateral or extraneous to the contract . . . ."  *Vorcom Internet Servs.*, 2013 WL 335717, at *4.  Here, in paragraphs 116-24 and 138-46, ACS has alleged several fraudulent misrepresentations by Mr. Avellanet, as an agent and employee of Airbus, that are collateral or extraneous to the Contracts.

138.    On numerous occasions (as described with specificity in paragraphs 76-81), Mr. Avellanet, acting as the agent and employee of Airbus, expressly stated to ACS material misrepresentations or omissions of fact that he knew to be false with the intent to defraud ACS, who reasonably relied on such misrepresentations or omissions and, as a result, sustained damages.

139.    On May 19, 2021, when ACS sought to confirm whether Airbus gave their employees a personal budget for trips, Mr. Avellanet replied, via email, in the affirmative: "Yep! Only through negotiations on employment conditions, but I get an allowance per year. Sometimes, the value is too high and in those cases, Airbus pays ACS and I pay Airbus back the 'overage' amount."

140.    Mr. Avellanet knew this was a material misrepresentation that did not accurately reflect Airbus's employee benefit program, but he purposefully stated it to convince ACS that his bookings were approved by Airbus, which was a reasonable concept given Mr. Avellanet's Airbus email address and title and because Airbus had paid prior ACS invoices that contained similar expenses on its account.

141.    On June 11, 2021, when ACS asked Mr. Avellanet whether he would like an invoice to be taken off the 2021 balance, Mr. Avellanet replied, via email: "That's fine. I'll clarify internally how to handle later."

142.    Mr. Avellanet knew this was a material misrepresentation or omission that did not accurately portray the actual circumstances because he would not be informing Airbus of this transaction.  Mr. Avellanet intentionally worded his email in a way to convince ACS that Airbus was involved in the processing and accounting of his bookings, which was a reasonable concept given Mr. Avellanet's past reassurances on Airbus's finance department and CFO's participation, such as when he stated, via email,  to ACS: "[j]ust leaving my finance office, currently planned to pay all on the next run but its [sic] is not until end of month" on November 8, 2021; "[j]ust quick payment update, my CFO signed off on the emergency transfer" on February 10, 2020; and "PS, I need to move our text group. Airbus has begun banning texts about *company business*" (emphasis added) on April 21, 2020.

143.    On October 26, 2020, Mr. Avellanet asked ACS to "make sure ["Trip Reason: Women in Aviation Conf"] [is] on the invoice somewhere" for roundtrip first class American Airlines tickets from PNS to Phoenix Arizona, departing on November 5, 2020 and returning on November 8, 2020, that ACS booked for "Madison Jade Avellanet" at Mr. Avellanet's request.

144.    Mr. Avellanet knew this reason for booking the airline tickets was a material misrepresentation because there was no "Women in Aviation Conf[erence]" on or around November 2020 in Phoenix, Arizona.  Women in Aviation International held their 2020 conference in Orlando, Florida from March 5-7, 2020.  International Aviation Women's Association held their 2020 conference virtually from October 13-15, 2020.  Mr. Avellanet purposefully made this request with the intention of defrauding ACS into relying on his assertions that the booking was made in connection with an Airbus-approved reason.  ACS's reliance on Mr. Avellanet's was reasonable because of Mr. Avellanet's repeated misrepresentations and omissions regarding his use of Airbus account with ACS.

145.    As additional examples of Mr. Avellanet's deceitful behavior and intent, on or around September 23, 2020, November 16, 2020, and April 8, 2021, Mr. Avellanet requested ACS purchase multiple $500 gift cards for Disney World because "[w]e want to do a giveaway / raffle this weekend while at Disney amongst the teams /suppliers that are there."

146.    Mr. Avellanet knew this was a material misrepresentation that made it appear the gift cards would be used to reward or encourage business among Airbus's teams and suppliers when in actuality the gift cards would be used by his family and friends.

147.    Further, on August 3, 2021, Mr. Avellanet made an "Airbus request" that ACS book a truck to transport cargo from Pensacola Aviation Center to Atlanta Shine, an auto detailing, car wash, and car window tinting shop.  Labeling this request to move what is likely a personal car as an "Airbus request" is a material misrepresentation made with the intent to deceive ACS into thinking the request was approved by Airbus.

148.    Mr. Avellanet's repeated misrepresentations that Airbus approved of, and would pay, ACS's invoices shows that Mr. Avellanet never intended to pay ACS for the charters and bookings under the Contracts.

149.    Mr. Avellanet's repeated misrepresentations that Airbus approved of, and would pay, ACS's invoices shows that Mr. Avellanet's representations or omissions were made with the intention of inducing ACS's reliance and forcing ACS into executing the Contracts with Airbus.

150.     ACS's reliance on Mr. Avellanet's misrepresentations and omissions was reasonable given Airbus had already paid ACS $2,368,930.00 for over 180 invoices that contained similar expenses on its account, and Mr. Avellanet's fraudulent conduct took place at Airbus's offices and through the use of Airbus's resources, *e.g*., Airbus's email address, Airbus's account with ACS, and Airbus's name and goodwill.

151.     Mr. Avellanet's misrepresentations and omissions caused ACS's damages, in that, ACS rendered its services to charter aircraft and to book hotel accommodations, ground transportation, catering on board the aircraft and dining at destination, gift cards for use at destination, event tickets at destination, and other travel services—all without payment from Airbus.

152.     At all times relevant to this action, Mr. Avellanet was the agent and employee of Airbus and, that during the events described herein, was acting within the purpose and scope of such agency and employment, as evident by Mr. Avellanet's email address, signature block, automated "Out of Office" response that directed emails to a fellow Airbus colleague, and initials and signatures on behalf of Airbus on the Contracts, among other things.

153.     Mr. Avellanet's fraudulent conduct was generally foreseeable and a natural consequence of his employment as Airbus's Senior Logistics Transport Manager, as he had access to Airbus's account with ACS to coordinate Airbus business-related transportation and travel.

154.     At all times relevant to this action, Mr. Avellanet acted with an intent to benefit Airbus.

155.     Airbus had knowledge, or should have had knowledge, of the repeated fraudulent conduct of its agent and employee Mr. Avellanet.  On several occasions, Mr. Avellanet reassured ACS that his finance team and CFO had approved ACS's invoices.  Airbus cannot avoid liability by turning a blind eye to Mr. Avellanet's fraudulent conduct which took place at Airbus's offices and through the use of Airbus's resources, *e.g*., Airbus's email address, Airbus's account with ACS, and Airbus's name and goodwill.

156.    Indeed, Airbus ratified Mr. Avellanet's fraudulent conduct by making payment to ACS on over 180 invoices that contained similar expenses on its account.

157.    Accordingly, Airbus is vicariously liable under the doctrine of *respondeat superior* for the fraudulent conduct of its agent and employee Mr. Avellanet.

## FOURTH CAUSE OF ACTION
## NEGLIGENT HIRING, TRAINING, AND SUPERVISION

158.    ACS repeats, reiterates, and realleges each and every allegation contained in paragraphs 1 through 157 as if fully set forth herein.

159.    Airbus was responsible for employing, hiring, supervising, retaining, directing, controlling, training, assisting, and overseeing properly qualified, experienced, and competent personnel involved in or responsible for the use of Airbus's account with ACS, including Mr. Avellanet.

160.    Airbus was negligent in employing, hiring, supervising, retaining, directing, controlling, training, assisting, and overseeing properly qualified, experienced, and competent personnel involved in or responsible for the use of Airbus's account with ACS in that Mr. Avellanet was, among other things, negligent, reckless, improperly qualified and experienced, and lacked the requisite competence.

161.    Airbus employed, hired, supervised, retained, trained, directed, controlled, supervised, assisted, oversaw, and certified that Mr. Avellanet was able to use Airbus's account with ACS without abusing it.

162.    Mr. Avellanet was unfit or incompetent to perform the work for which he was hired, retained, trained, directed, supervised, and certified.

163.    Airbus knew or should have known that Mr. Avellanet was unfit or incompetent and that this unfitness and incompetence created a risk of harm to Airbus's business relations, including Airbus's relationship with ACS.

164.    As a direct and legal result of Mr. Avellanet's fraudulent conduct, ACS has incurred substantial damages and continues to incur damages in the form of unpaid invoices, lost profits,

business interruption, and associated costs, fees (including but not limited to attorney fees), interest, and expenses.

165.    At all times relevant to this action, Mr. Avellanet was acting within the course and scope of his employment with Airbus and as such Airbus is liable for the damages arising from Mr. Avellanet's fraudulent conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs AIR CHARTER SERVICE INC., AIR CHARTER SERVICE GEORGIA INC., THE TRAVEL DIVISION LTD., and AIR CHARTER SERVICE TRUCKING INC. respectfully request that the Court:

i.      Enter Judgment in their favor and against Defendant AIRBUS AMERICAS INC. in the amount of $1,492,536.56, plus interest, attorney's fees, and costs;

ii.     Award compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial; and

iii.    Award such other further relief to which Plaintiffs may be entitled as a matter of law or equity, or which the Court deems just and proper.

Dated:  New York, New York
        August 1, 2022

                                        Respectfully submitted,

                                        CONDON & FORSYTH LLP

                                        By:  _____
                                             Bartholomew J. Banino
                                             bbanino@condonlaw.com
                                             Marissa N. Lefland
                                             mlefland@condonlaw.com
                                             Mirin E. Park
                                             mpark@condonlaw.com

7 Times Square, 18th Floor
New York, New York 10036
Tel:  (212) 490-9100
Fax:  (212) 370-4453

*Attorneys for Plaintiffs*
AIR CHARTER SERVICE INC.,
AIR CHARTER SERVICE GEORGIA INC.,
THE TRAVEL DIVISION LTD., and
AIR CHARTER SERVICE TRUCKING INC.